**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JONATHAN M. DETAR | CASE NO. 1:13-cv-02972- GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 5, 6, 7, 9 |

## <u>MEMORANDUM</u>

### I.   Procedural Background

On December 13, 2010, Plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). (Tr. 161-73). On March 7, 2011, the Bureau of Disability Determination denied these applications (Tr. 72-91), and Plaintiff filed a request for a hearing on May 2, 2011.  (Tr. 114). On April 4, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 31-63). On June 11, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-30). On July 23, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals denied on October 18, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr.

1-6).

On December 11, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 18, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 5, 6). On April 1, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 7). On May 1, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 9). On July 16, 2014, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 12, 13, 14).  The matter is now ripe for review.

## II.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y*

*of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### IV. Relevant Facts in the Record

Plaintiff was born on September 17, 1984 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 25). 20 C.F.R. § 404.1563. Plaintiff has a limited education and past relevant work as a shift manager, cashier, and dishwasher. (Tr. 25). Plaintiff's appeal addresses only

the ALJ's assessment of his seizures and mental impairments, and the Court will limit its discussion accordingly.

## A. Function Report and Testimony

On January 11, 2011, Plaintiff submitted a Function Report. (Tr. 241-51). He reported that pain interferes with his sleep but not his personal care. (Tr. 242). He indicated that he can use public transportation and go out alone, but cannot drive because of epilepsy and a brain tumor. (Tr. 244). He reported that he does not spend time with others and does not go anywhere on a regular basis. (Tr. 245). He indicated problems walking, standing, and lifting due to epilepsy and memory and concentration due to his brain tumor. (Tr. 246). He indicated that he did not have problems getting along with others, but does not follow written instructions very well and cannot pay attention for "long." (Tr. 246). He reported that he gets along with authority figures "pretty good," had never been fired from a job due to problems getting along with others, and handles changes in routine "very well." (Tr. 247). However, he indicated that he does not handle stress well. (Tr. 247). He also reported constant pain from seizures and headaches from his brain tumor. (Tr. 249). He reported that he had seizures once or twice a week, three to four times per month, despite taking medications. (Tr. 251).

On April 4, 2012, Plaintiff appeared and testified before the ALJ. (Tr. 38). He testified that he did not have a drivers license due to epilepsy and legal

problems. (Tr. 38). He testified that he "average[d]...two to three seizures a week" since starting Keppra in 2009. (Tr. 45). He testified that he had only been "seizure free for a little short of a month" after starting Keppra. (Tr. 45). He testified that his depression caused him to be overwhelmed and lose interest in activities. (Tr. 47). Plaintiff's fiancé testified that, "over the last couple of years," he had "roughly two [seizures] a month," and "sometimes six a month." (Tr. 52-53).

### B. Medical Records

Plaintiff began reporting seizures in 2008. (Tr. 264). On November 4, 2008, an MRI of Plaintiff's brain was negative except for a "small right pituitary microadenoma." (Tr. 264).

On April 26, 2010, Plaintiff presented to Dr. Brian Burke, M.D., at Bellefonte Family Practice, after being released from jail. (Tr. 269). Dr. Burke noted that Plaintiff's "brain abnormality on MRI" was "not felt to be causing symptoms." (Tr. 269). Plaintiff had been "tolerating medications well." (Tr. 269). Plaintiff was "aware that he does not meet criteria for disability but he has hired a lawyer to get disability from SSI." (Tr. 269).  Plaintiff did not mention any problems with seizures. (Tr. 269-70).

On May 20, 2010, Plaintiff presented to Dr. Muhammad Qamar, M.D., at Universal Community Behavioral Health Outpatient Clinic ("Universal"). (Tr. 294). Plaintiff had been seeing Dr. Qamar, but had stopped coming for a few

months, so he was being evaluated at a "new patient." (Tr. 294). Plaintiff reported symptoms of depression and post-traumatic stress disorder ("PTSD"). (Tr. 294-95). On mental status examination, his mood was "depressed and anxious" but his general appearance, motor activity, and speech were normal, his thought process was logical, his IQ, insight, and judgment were fair, and his "capacity for activities of daily living" was "good." (Tr. 296). Plaintiff was diagnosed with major depressive disorder secondary to brain tumor and PTSD and assessed a GAF of 50, with the highest GAF in the past year of 70. (Tr. 297). Plaintiff was prescribed Zoloft for depression, Prazosin for nightmares, and Vistaril for anxiety. (Tr. 297). On June 3, 2010, Plaintiff reported that the medications were "helping him" and Dr. Qamar observed that he was "stable on his medications." (Tr. 299). His mood was "fine" and his mental status examination was otherwise normal. (Tr. 299). His medications were continued except for Prazosin, which was increased due to some continued nightmares. (Tr. 299).

On June 7, 2010, an MRI of Plaintiff's brain was negative except for "one or two tiny new focal areas of increased FLAIR signal in the deep white matter, probably small vessel ischemic disease." (Tr. 281).

On July 8, 2010, Plaintiff followed-up with Dr. Qamar. (Tr. 300). He had missed an appointment on July 1, 2010 and ran out of medication, so he reported increased symptoms. (Tr. 300). He stated that "when he was taking his medications

he did very good and would like to continue the same medications." (Tr. 300). His mood was "fine" and his mental status examination was otherwise normal. (Tr. 300). Plaintiff's medications were continued. (Tr. 300).  On September 13, 2010, Plaintiff reported that his "last seizure was in June." (Tr. 382).

On February 4, 2011, Plaintiff had a consultative examination with Dr. Dana Irwin, PhD. (Tr. 303). Plaintiff reported that his fiancé had multiple sclerosis, was ambulatory with a cane, and received SSI, so he had assumed most domestic tasks in their residence. (Tr. 304). He reported social isolation since his discharge from prison. (Tr. 304). Plaintiff's mental status examination indicated:

> Speech was comprehensible and logical, devoid of bizarre thought content and process to suggest a psychotic or developmental disorder. Pace, prosody, and volume were all WNL. Exchanges were interpersonally reciprocal, on-target with adequate give&take and devoid of stereotyped statements. Mood was euthymic. Psychomotor behavior was fluid and extemporaneous, nonstereotyped with gestures congruent with his statements and facial expressions… did not exhibit, psychotic features…did not indicate discrete anxiety conditions, including agoraphobia, panic, generalized worry, obsessive thinking, compulsive behavior rituals, and traumatic stress. If anything, his history of assaultive behavior in school, home, and prison suggest insufficient anxiety and delay that may be associated with intoxication, addiction withdrawal, personality style, and/or neurological condition if any…he was emphatic about his independence with personal finances and compensation checks…demonstrated intact remote recall, easily establishing a timeline with interview queries, and demonstrated intact immediate recall in an error-free and quick performance with a test of calculations. He could sum four types of coins presented verbally in various combinations, indicating good focus, selective attention, alternating attention, and divided attention. With other measures of knowledge, Jon demonstrated average performance also…. Abstraction fell in the average range as well, based on his performance with a test of analogies. These unimpaired results with a screening of such cognitive functions as memory

and fund of information are congruent with his appearance absent of gross neurological impairments in motor functions and speech, as well as with his attainments in employment.

Social and critical judgment have been marked by behavior disruptive to community and lawful society, per the assault history and legal infractions since age 16 and extending into the prison environment… it is not possible in one meeting to differentiate intoxicant effects from any neurological behavioral effects from innately antisocial value systems informing his decision-making. In today's meeting Jon formulated socialized and efficient responses to hypothetical scenarios (eg would take envelope to PO) and to queries of social judgment (eg parole serves purpose of "modifying people who can't live by society's laws"). There were not indicators of other characterological patterns in excess of the addictions/antisocial features (e perfectionistic, theatrical, suspicious, narcissistic, hermetic, avoidant, dependent etc)…displays low self-awareness and psychological insight.

(Tr. 304-05). Plaintiff endorsed "mild" depressive symptomology. (Tr. 304). Dr. Irwin diagnosed Plaintiff with polysubstance dependence, early partial remission, and assessed him to have a GAF of 51. (Tr. 306). Plaintiff's activities of daily living were "intact," his social functioning had been "disruptive," his concentration was "viable," and his "persistence appear[ed] low, marked by impulsive behavior that results from intoxication and possibly from any neurological conditions." (Tr. 306). She opined that Plaintiff's ability to complete work-related activities was not affected by his mental impairment. (Tr. 307).

On March 2, 2011, state agency psychologist Dr. James Vizza, Psy.D., reviewed Plaintiff's file and opined that he had mild restriction of activities of daily living, moderate difficulties in social functioning, mild difficulties in

concentration, persistence, and pace, and no episodes of decompensation of extended duration. (Tr. 85).

On March 7, 2011, Plaintiff followed-up with Dr. Burke. (Tr. 310). He reported "more seizures recently" but was "doing pretty well with his anxiety and depression." (Tr. 310). Plaintiff's medications were continued. (Tr. 310).

On March 7, 2011, Dr. James Caramanna, M.D., reviewed Plaintiff's file and issued a medical opinion. (Tr. 76). He reviewed Plaintiff's brain MRI from June of 2010, Dr. Burke's April 2010 progress note, and mental status examinations at Universal from May and July of 2010. (Tr. 75). He opined that there was insufficient evidence in the file to make a decision on Plaintiff's claim. (Tr. 75).

On March 18, 2011, Plaintiff presented to Dr. Iprhan Gaslightwala, M.D., for a consultation for Hepatitis. (Tr. 327). Plaintiff reported two seizures in the past month, and also reported two to three seizures per week. (Tr. 327). Plaintiff was a poor candidate for Hepatitis treatment due to his depression, seizures, and recent period of sobriety. (Tr. 327). On March 21, 2011, an MRI of Plaintiff's brain had the same findings as the MRI in June of 2010. (Tr. 281, 338). Plaintiff did not receive any subsequent treatment until August of 2011.

On August 25, 2011, Plaintiff presented to Dr. Tushar Mehta, M.D., at universal. (Tr. 371). Plaintiff's diagnosis remained "Mood Disorder, Secondary to

Brain Tumor." (Tr. 371). Plaintiff reported nightmares, but his objective examination was otherwise normal. (Tr. 371). His medications were continued except for prazosin to help with nightmares. (Tr. 371). On September 22, 2011, Plaintiff reported having a seizure the previous week and nightmares, but his objective examination was otherwise normal. (Tr. 370). His medications were continued. (Tr. 370). On October 27, 2011, Plaintiff reported stress due to his mother and fiancé's illness, and Vistaril was added to his medication regimen of Zoloft and prazosin. (Tr. 369). On January 26, 2012, Plaintiff reported that he has "a lot of other stress, but able to manage with medications, but he is running out of medication sometimes because he is not able to come to the clinic on a regular basis because he does not drive and he has seizure problems."(Tr. 368). Plaintiff was "work[ing] full time as a cook at local restaurant." (Tr. 368). He "recently had a seizure." (Tr. 368). His objective examination was normal and his medications were continued. (Tr. 368). On February 16, 2012, notes indicate "no seizures reported." (Tr. 367). Plaintiff's objective examination was normal and his medications were continued. (Tr. 367).

On November 14, 2011, Plaintiff followed-up with Dr. Gaslightwala. (Tr. 350). He noted that Plaintiff's epilepsy was "related to" intravenous drug use, not idiopathic causes. (Tr. 350). Plaintiff reported that his depression was "stable," with "good days and bad," with no change to his psychiatric medication, sleeping

well, eating well, and improved anhedonia. (Tr. 350). He reported two seizures in the past month, otherwise "none for 6 mos." (Tr. 350). Plaintiff was a better candidate for Hepatitis therapy, as his "seizure disorder [was] better controlled" and his "depression has remained stable." (Tr. 352). Dr. Gaslightwala indicated that they might be able to start Hepatitis therapy the following summer. (Tr. 352).

### C. ALJ Findings

On June 11, 2012, the ALJ issued the decision. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2010, the alleged onset date. (Tr. 13). At step two, the ALJ found that Plaintiff's pituitary tumor, a seizure disorder, a chronic hepatitis C infection with associated malaise and fatigue, a depressive disorder, a mood disorder, a post-traumatic stress disorder, and a history of alcohol dependence in remission and drug abuse in remission were medically determinable and severe. (Tr. 13). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 14). The ALJ found that Plaintiff had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except is limited to lifting/carrying 20 pounds occasionally or 10 pounds frequently, and standing/walking 6 hours of an 8-hour workday, is limited to no exposure to extreme heat/cold, and no exposure to hazardous conditions such as unprotected heights, dangerous machinery, or uneven surfaces, is limited to simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes, and is limited to no work at production-rate pace.

(Tr. 15-16).

A step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 25). At step five, in accordance with the VE testimony, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 25). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 26).

## V.      Plaintiff Allegations of Error

### A. The ALJ's assessment of Listing 11.02

Plaintiff asserts that the ALJ erred in finding that he did not meet Listing 11.02 for his epilepsy symptoms. (Pl. Brief at 2-4) (citing 20 C.F.R. § 404, Subpart P, Appendix 1, §11.02). Listing 11.02 requires:

> 1.02 Epilepsy - convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

*Id.* Plaintiff must establish the present of each element of a Listing. J*ohnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 202–203 (3d Cir.2008) ("[A] claimant must point to evidence which establishes all of its criteria to demonstrate legal error warranting a remand").

Here, the ALJ found that Plaintiff did not have seizures at the requisite frequency—more than once per month—and did not meet the requirements of

Listing 11.02. (Tr. 14). The only evidence Plaintiff presented of the frequency of his seizures were his and his fiancée's subjective claims. (Pl. Brief at 2-4). Plaintiff cites to medical records that also contain their subjective claims, but the mere memorialization of subjective claims into medical reports does not transform the subjective claims into objective evidence:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003).

In order to evaluate the subjective claims of Plaintiff and his fiancée, the ALJ had to assess their credibility. When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing  20 C.F.R. § 404.1529(c)).  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. In terms of treatment, SSR 96-7p provides that:

> Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.
>
> On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints…

*Id*.

Here, the ALJ rejected the claims of Plaintiff and his fiancé because they were inconsistent with other claims they made to medical providers during the relevant period, they were inconsistent with Dr. Burke's opinions that Plaintiff was

employable, they were inconsistent with the state agency medical consultant's opinion who reviewed Plaintiff's file, and they were inconsistent with Plaintiff's conservative treatment for seizures.  (Tr. 14, 16).

Plaintiff contends that his inconsistent claims to medical providers were only "occasional remarks to the contrary" and that his treatment was not conservative because his dose of Keppra was increased from 500 m.g. per day to 2,000 m.g. per day. (Pl. Brief at 4).

Although Plaintiff asserts that his inconsistent claims were only "occasional remarks to the contrary," a "strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. Here, Plaintiff asserts disability as of February 1, 2010. *Supra.* The ALJ cited to Plaintiff's report in September of 2010 that he had no seizures since June of 2010. (Tr. 16, 382). The ALJ also cited to Plaintiff's report in November of 2011 that, aside from two seizures that month, he had "none for 6 mos." (Tr. 350).[1] These reports to treating providers contradicts Plaintiff's claim that he only had "two to three weeks that [he] didn't have a seizure." (Tr. 45). They also contradict Plaintiff's claim that he had "average[d]…two to three seizures a week" since starting Keppra in 2009 and Plaintiff's fiancée's claim that he had

---

[1] Plaintiff's reports to treating providers of decreased seizures is also consistent with notations in the record that Plaintiff's epilepsy was "related to" intravenous drug use rather than idiopathic causes, as Plaintiff reports abstinence since September of 2010. (Tr. 350).

"roughly two" seizures per month "over the last the couple of years." (Tr. 45). Thus, the ALJ properly rejected the claims of Plaintiff and Plaintiff's fiancée on the ground that he made inconsistent claims regarding the frequency of his seizure activity. (Tr. 16); SSR 96-7p.

The ALJ also properly concluded that Plaintiff's treatment was conservative. SSR 96-7p. Plaintiff identifies only one medication change during the relevant period. (Pl. Brief at 2-4). Generally, treatment with only a stable dose of medication undermines a claimant's allegations of debilitating limitations. *Parsha v. Colvin*, EDCV 13-1799-OP, 2014 WL 2761211, at *3 (C.D. Cal. June 18, 2014) ("[T]he medical evidence show[ed] routine, conservative treatment for seizures" where claimant was treated only with medication); *Galvan v. Astrue*, CV 11-7260 JC, 2012 WL 952414, at *6 (C.D. Cal. Mar. 21, 2012) ("[P]laintiff had been receiving only conservative treatment (*i.e.,* medication only) for her seizure disorder"). Plaintiff has not challenged the ALJ's conclusion that "he has not required hospitalization for localization of his seizure activity, nor has he required any surgical intervention for [seizures]." (Tr. 22). Thus, the ALJ was entitled to conclude that Plaintiff's conservative treatment contradicted his claims regarding the frequency of his seizures.

Finally, the ALJ relied on the medical opinion evidence. (Tr. 16-23). Plaintiff did not produce any medical opinion that supported his claimed frequency

of seizures. In contrast, the state medical consultant that reviewed Plaintiff's file concluded that Plaintiff did not have the requisite frequency of seizures to meet the Listing. *Supra.* Moreover, Plaintiff's treating physician, Dr. Burke, opined that Plaintiff was employable despite his seizure disorder. *Supra.* These opinions are medical evidence on which the ALJ properly relied to reject the credibility of Plaintiff and Plaintiff's fiancé regarding the frequency of his seizures. SSR 96-7p.

A reasonable mind could accept Plaintiff's inconsistent claims to medical providers during the relevant period, the medical opinions, and Plaintiff's conservative treatment as adequate to conclude that his subjective claims and the subjective claims of his fiancée were not fully credible. Plaintiff has not produced any evidence of the frequency of his seizures other than his subjective claims and the subjective claims of his fiancée.[2]

Thus, substantial evidence supports the ALJ's conclusion that Plaintiff did not meet Listing 11.02. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

## B. The ALJ's assessment of Listing 12.00, *et seq.*

Plaintiff asserts that the ALJ erred in assessing Listing 12.00, *et seq.* (Pl. Brief at 5-7). Each of these Listings requires that Plaintiff meet the "Paragraph B" criteria, which require at least two of the following:

---

[2] Plaintiff declined to submit any testimony from his mother, despite the ALJ's invitation to do so. (Tr. 54-55). The ALJ specifically stated "if you want to submit something from the mother via an affidavit or a statement, you can do that if you feel it's appropriate, although I don't think it's going to be too much different than what has been testified to." (Tr. 55).

1. Marked restriction of activities of daily living; or
2. Marked restriction in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04(A). A marked limitation is one that "interfere[s] seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1,Section 12.00(C).

Plaintiff asserts that, because his seizure disorder impacts his activities of daily living, the ALJ erred in assessing the Paragraph B criteria. (Pl. Brief at 6). However, the limitations in Paragraph B must be due to mental impairments, not physical impairments, in order to establish eligibility for one of the mental health Listings. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04(A) (Claimant must establish that affective disorder "result[s] in" the Paragraph B criteria); *Dragoiu v. Comm'r of Soc. Sec.*, 13-14786, 2015 WL 1245907, at *8 (E.D. Mich. Mar. 18, 2015) (ALJ properly found less than marked limitation in activities of daily living where "activities of daily living were primarily limited by her physical complaints"); *Best v. Astrue*, C10-836-MJP-BAT, 2010 WL 5185446, at *2 (W.D. Wash. Dec. 1, 2010) report and recommendation adopted, C10-836-MJP-BAT, 2010 WL 5287976 (W.D. Wash. Dec. 16, 2010) ("To the extent that Ms. Best's physical symptoms limit her activities of daily living, these complaints lend absolutely no support to her argument that she meets Listing 12.04"); *Hutchins v.*

*Astrue*, CIV.A. 8:10-142-JFA, 2010 WL 5684396, at *5 (D.S.C. Dec. 21, 2010) report and recommendation adopted as modified, C/A 8:10-142 JFABHH, 2011 WL 344090 (D.S.C. Feb. 1, 2011) ("[E]ven if the plaintiff's physical impairments produced restriction of activities of daily living, for instance, without proof that the mental impairment also did so, the plaintiff could not meet the Listings' demands").

Plaintiff also asserts that the ALJ should have credited various GAF scores. (Pl. Brief at 5-7). However, the ALJ found that:

> GAF scores are highly subjective ratings that can easily vary from one practitioner to the next and generally represent only a "snapshot" of the presentation of information available from a client on the day of assessment. Moreover, GAF scores include not only Axis I and II diagnoses, but Axis II and IV factors, such as general medical conditions or psychosocial or environmental problems, and an assigned GAF of 50 or less could also represent such things as loss of job/unemployment, financial difficulties, medical difficulties, and other stressors which are not necessary factors in the disability evaluation. A low rating, in fact, can occur in the absence of any actual mental health difficulties. Thus, the utilization of the GAF score for predictive purposes is severely impaired by a lack of reliability, validity, and subjective interpretation.

(Tr. 24). A reasonable mind could accept the above-described explanation and evidence as adequate to reject the GAF scores. Consequently, the ALJ did not err in finding that Plaintiff did not meet a Listing despite GAF scores of 40-50. *See Gilroy v. Astrue*, 351 Fed. Appx. 714, 715 (3d Cir. 2009) ("A GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings").

Finally, Plaintiff asserts that Dr. Qamar's opinion that Plaintiff was temporarily disabled establishes that the ALJ erred in concluding that Plaintiff did not meet a Listing. (Pl. Brief at 5). However, Dr. Qamar's opinion did not address the Listing criteria. *Supra*. Moreover, Plaintiff has not challenged the ALJ's assignment of "little weight" to this opinion "because at that time Dr. Qamar indicated that the claimant had stopped coming to him and that he had presented to the clinic after a few months as a new patient" and that "Dr. Qamar rendered his opinions prior to the claimant's having realized the efficacy of regular psychiatric medication management services." (Tr. 23-24). The ALJ accurately characterized the record and concluded that Dr. Qamar's opinion was inconsistent with Plaintiff's improvement after treatment. *Supra*. The state agency reviewing psychologist and the state agency examining psychiatrist both addressed the Paragraph B Criteria, and found that Plaintiff did not meet the requirements. (Tr. 85, 306-07).

The ALJ found that Plaintiff had only a mild limitation in activities of daily living because:

> [He cared] for his own personal needs, watching television, completing word-search puzzles, preparing simple meals, shopping for food once a week, performing household chores such as doing laundry, vacuuming and sweeping, caring for a pet bird and fish, and walking to the Post Office with his fiancé…he cares for his fiance, who is afflicted with multiple sclerosis, by helping her with baths and by giving her weekly prescribed injections…in May 2010 Dr. Muhammad Qamar, an examining psychiatrist, reported that the claimant was dressed and groomed appropriately and that

> he had a good capacity for activities of daily living... in February 2011, Dr.
> Dana Irwin, a consulting psychologist, indicated that the claimant reportedly
> assumed most domestic tasks in his residence because his paramour had
> multiple sclerosis, was ambulatory with a cane, and was receiving
> Supplemental Security Income…Dr. Irwin also reported that the claimant
> was emphatic about his independence with personal finances and
> compensation checks.

(Tr. 18). A reasonable mind could accept the above-described explanation and

evidence as adequate, and Plaintiff has no provided no reason to disturb these

conclusions.

The ALJ found that Plaintiff had only a mild limitation in social functioning

because:

> The evidence shows that the claimant lives with and cares for his ill fiancé
> with no significant difficulties (Exhibit B-5E; Testimony). In addition, the
> claimant has reported that he shops in stores, that he and his fiance walk to
> the Post Office, and that he uses public transportation (Exhibit B-5E). The
> claimant has also reported that he can go out alone, that he gets along with
> authority figures pretty well, and that he has no problems getting along with
> family, friends, neighbors or others (Id.). Moreover, in May 2010 Dr. Qamar
> reported that the claimant had good communication skills (Exhibit B-6F).
> Additionally, in July 2010 Dr. Qamar reported that the claimant was
> cooperative (Id.). Furthermore, in February 2011, Dr. Irwin indicated that
> exchanges with the claimant were interpersonally reciprocal and on target
> with adequate give-and-take and devoid of stereotyped statements (Exhibit
> B-7F). Dr. Irwin also indicated that the claimant formulated socialized and
> efficient responses to hypothetical scenarios and to queries of social
> judgment (Id.). In an accompanying medical source statement, Dr. Irwin
> indicated that the claimant's ability to interact appropriately with the public,
> supervisors, and co-workers was not affected by his impairments (Id.). It is
> noted that Dr. Irwin went on to indicate that the claimant's social and critical
> judgment had been marked by behavior disruptive to community and lawful
> society, per an assault history and legal infractions since age 16 and
> extending into the prison environment (Id.). However, Dr. Irwin further
> noted that there were no indicators of other characterological patterns in

excess of the addictions/antisocial features and that the claimant's preferred leisure included occasional visits with neighbors (Id.). What's more, in September 2011 Dr. Tushar Mehta, a treating psychiatrist, reported that the claimant was pleasant and cooperative (Exhibit B-9F).

Additionally, the claimant has never been fired or laid off from a job because of problems getting along with other people (Exhibit B-5E). As previously indicated, he has a history of assaultive behavior, for which he was incarcerated at age 16 and most recently for four segmented months in 2010 secondary to a tight with his brother, and he testified at the hearing in April 2012 that he remained on probation (Exhibits B-7F, B-9F, B-IOF; Testimony). However, there is no evidence of any further legal involvement. Also, no medical source of record has noted any signs of maladaptive or inappropriate behavior on physical examination, nor is there evidence of any evictions set forth in the record. Finally, the Administrative Law Judge notes that the claimant had no difficulty interacting with his representative or others in the hearing room, and he displayed no inappropriate social behavior throughout the course of the hearing.

(Tr. 18). A reasonable mind could accept the above-described explanation and evidence as adequate, and Plaintiff has no provided no reason to disturb these conclusions. Substantial evidence supports the ALJ's Listing Assessment. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: March 31, 2015                           *s/Gerald B. Cohn*
                                              GERALD B. COHN
                                    UNITED STATES MAGISTRATE JUDGE